AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

United States of America

v.

ROBERT CLAYTON JACOBS III,

Defendant,

Case No.   2:22-mj-00957-DUTY



## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of January 14, 2022, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(1) | Felon in Possession of a Firearm |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Christopher Stantzos
Complainant's signature

Christopher Stantzos, ATF Special Agent
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   March 8, 2022

*Patricia Donahue*
Judge's signature

City and state:   Los Angeles, California

Hon. Patricia Donahue, U.S. Magistrate Judge
Printed name and title

AUSA:  Julia Hu x3802

**AFFIDAVIT**

I, Christopher Stantzos, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrant against ROBERT CLAYTON JACOBS III ("JACOBS") for violation of 18 U.S.C. § 922(g)(1): Felon in Possession of a Firearm.

2. This affidavit is also made in support of an application for a warrant to search the following digital device (the "SUBJECT DEVICE"), in the custody of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") in Santa Maria, California, as described more fully in Attachment A:

   a. one black Samsung cell phone, unknown model and serial number, with a sticker portraying a pocketknife and a sticker portraying a lighter attached to the back.

3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Section 922(g) (Felon in Possession of a Firearm); Section 924(c) (possession of a firearm in furtherance of a drug trafficking crime); Title 26, United States Code, Section 5861(d) (Possession of an Unregistered Rifle in NFRTR with a Barrel of Less than 16 Inches in Length); and Title 21, United States Code, Section 841(a)(1) (Possession With Intent to Distribute Controlled Substances) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5. I am a Special Agent ("SA") with ATF and have been so employed for two years. I was hired by ATF in March 2020 and attended the ATF Academy from March through December 2020, where I received approximately 1,000 hours of formal training in various aspects of conducting firearms, explosives, arson, firearms trafficking, and gang investigations. Before joining the ATF, I was an Intelligence Analyst ("IA") for the Federal Bureau of Investigation ("FBI") for approximately four and a half years. As an IA, I produced intelligence products in furtherance of civil rights crimes investigations and complex international money laundering investigations. Before joining the FBI, I was a forensic scientist for the Washington, DC Department of Forensic Sciences, where I identified, documented, preserved, and collected physical evidence from crime scenes for nearly two years.

6.      I have debriefed multiple informants, witnesses, and subjects who had personal knowledge regarding illegal firearms and narcotics trafficking.  Additionally, I have participated in many aspects of gang, firearms, and drug investigations, including undercover operations, arrests, and surveillance.  I am familiar with firearms and drug traffickers' methods of operation, including the distribution, storage, and transportation of drugs, as well as the collection of money proceeds of drug-trafficking and money-laundering methods used to conceal the nature of the proceeds.  I have participated in multiple investigations involving the illegal manufacture and sale of firearms.  I am familiar with the methods employed by gang members to thwart detection by law enforcement including the use of cellular telephone technology, counter-surveillance techniques, false or fictitious identities and addresses, money-laundering techniques, and coded language.

7.      Currently, I am assigned to the Los Angeles Field Division, Santa Maria Satellite Office ("SMSO") of the ATF.  I have been assigned to the SMSO since March 2020, in which time I have participated in controlled purchase operations, undercover operations, search warrants, and gang investigations in Los Angeles, Santa Barbara, and San Luis Obispo Counties.

### III.  SUMMARY OF PROBABLE CAUSE

8.      On January 14, 2022, Santa Barbara Sheriff's Office ("SBSO") deputies conducted a traffic stop and subsequently arrested JACOBS for driving under the influence ("DUI") of drugs in Montecito, California.  SBSO deputies then conducted a

probable cause search of JACOBS's car for additional evidence of drugs and an inventory of the contents of the car prior to towing. During their search, deputies found one Colt Government Model MKIV .45 caliber pistol, bearing serial number SS10327E, in the front passenger seat area of JACOBS's car, along with three additional firearms bearing no serial number (commonly referred to as "ghost guns") and various magazines and ammunition. Deputies also found the SUBJECT DEVICE in the center console of JACOBS's car.

    9. Following the incident, SBSO deputies obtained a state search warrant for JACOBS's residence located on Calle Del Sol Road in Santa Barbara, California. On January 18, 2022, during execution of the search warrant, SBSO deputies found three ghost rifles with no serial numbers; various magazines and ammunition; a suspected handgun silencer; and various firearms parts, including receivers, barrels, trigger assemblies, handgun sights, rifle sights, rifle handguards, rifle handgrips, and adjustable rifle stocks.

    10. On February 23, 2022, I measured the length of the barrels of two of the ghost gun rifles found on January 18, 2022 and found the barrel of the rifle that was red and black in color to be approximately 12 inches in length and the barrel of the rifle that was black and silver in color to be nine inches in length.

    11. JACOBS has previously been convicted of a felony and is therefore prohibited from possessing firearms or ammunition. Specifically, on or about March 20, 2014, JACOBS was convicted

of grand theft, in violation of California Penal Code Section 487(a)(F), in the Superior Court of California, County of Santa Barbara, Case Number 1443571.

## IV. STATEMENT OF PROBABLE CAUSE

12. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A. SBSO Traffic Stop of JACOBS Results in DUI Investigation

13. On or about January 14, 2022, SBSO Deputy John Valenti conducted a traffic stop of a 2000 Ford Expedition bearing California license plate number ending in 762 for having an expired registration tag and a broken brake light. The stop was conducted in the area of Coast Village Road and Olive Mill Road in Montecito, California. During the traffic stop, Deputy Valenti identified the driver as JACOBS. JACOBS did not have a valid driver's license.

14. Later during the traffic stop, SBSO Deputy Rockwell Ellis arrived to conduct a DUI drugs investigation of JACOBS, which was captured on Deputy Valenti's body-worn camera. Based on Deputy Ellis's DUI investigation, which included Deputy Ellis's observations that JACOBS's eyes were red and watery, that JACOBS had track marks on both forearms with fresh injection sites, and other psychophysical tests of JACOBS, Deputy Ellis concluded that JACOBS was too impaired to operate a vehicle safely. JACOBS was arrested for driving under the influence, in violation of California Vehicle Code Section

5

23152(f), and taken to the Carpinteria Station for a drug recognition exam.

### B. Discovery of Colt Handgun and SUBJECT DEVICE in JACOBS's Vehicle

15. Following JACOBS's arrest, Deputy Ellis and Senior Deputy Delgadillo conducted a search of JACOBS's car for additional evidence of the DUI offense and an inventory of the contents of the car prior to it towed pursuant to California Vehicle Code § 22651(p). During their search, deputies found the following in the front passenger seat area of JACOBS's car:

    a. a Colt Government Model MKIV .45 caliber pistol, bearing serial number SS10327E;

    b. Three 9mm Glock-style handguns without serial numbers. Two of the 9mm handguns contained magazines, one of which was loaded with fifteen rounds of 9mm ammunition; and

    c. A box containing 36 rounds of .45 caliber ammunition.

16. In the center console of JACOBS's car, deputies found the SUBJECT DEVICE and a black bag containing suboxone and unknown type pills.

17. Deputies also found the following in the back seat area or rear area of JACOBS's car:

    a. A total of approximately 5.2 grams of suspected methamphetamine;

    b. A total of approximately 7.4 grams of suspected heroin;

        c.    A box containing various prescription medications;

        d.    A prescription bottle in JACOBS's name containing gabapentin, propranolol hydrochloride, and buspirone hydrochloride;

        e.    Eight concealable blade knives;

        f.    One pair of black metal knuckles; and

        g.    Seven lockpick kits and other lockpicking tools.

**C.    JACOBS's Post-Arrest Statements**

18.    After arresting JACOBS, Deputy Valenti transported JACOBS to Goleta Valley College Hospital for a voluntary blood test. Following the blood test, Deputy Valenti reminded JACOBS that Deputy Ellis had previously read JACOBS his Miranda rights at the scene. Deputy Valenti then asked JACOBS if he understood his rights and if JACOBS needed Deputy Valenti to read his Miranda rights to him again. JACOBS stated he did not need his Miranda rights read to him again. Deputy Valenti again asked JACOBS if he understood his rights and would be willing to answer questions about his arrest, to which JACOBS replied, "Sure."

19.    JACOBS initially told Deputy Valenti that the firearms found in his vehicle belonged to his grandfather who had recently passed away. However, JACOBS then recanted his story and said that the Colt Government Model MKIV pistol was gifted to him. According to JACOBS, in late 2020, he went to an acquaintance's residence in Goleta, California and saw another associate, K.D., at the residence. JACOBS said the Colt pistol

was sitting openly on a table.  JACOBS said he took the Colt pistol, and K.D. offered to let JACOBS keep it.

20. As to the three 9mm handguns bearing no serial number found in the car, JACOBS admitted that he manufactured them himself from components that he bought.

21. JACOBS also admitted that he ordered the ammunition from an online source.

22. JACOBS admitted that he was a convicted felon.

23. JACOBS also admitted that the drugs in the car belonged to him, and that he had used methamphetamine and heroin prior to driving his car earlier that evening.

### D. Search of JACOBS's Residence on Calle Del Sol in Santa Barbara, California Yields Additional Firearms

24. On January 16, 2022, at the request of the SBSO, the Honorable Brian Hill of the Superior Court for the State of California, County of Santa Barbara, signed a search warrant for firearms and firearms related parts and accessories at JACOBS's residence located on Calle Del Sol in Santa Barbara, California. This address was listed on JACOBS's driver's license and the registration of that car in which he was stopped on January 14, 2022.

25. On January 18, 2022, SBSO deputies and detectives executed the search warrant at JACOBS's residence.  Two occupants, J.J. and J.W., were at the residence during the search.  J.W. told the officers that two sheds in the backyard of the residence were locked and were used by JACOBS for storage.  J.W. said that she did not have a key to either shed.

26. SBSO deputies and detectives searched the white shed with red trim in the backyard of JACOBS's residence. The shed appeared to belong to JACOBS based on the fact an invoice for rifle stock and ammunition in JACOBS's name, as well as other boxes in JACOBS's name were found in the shed and J.W.'s statement that JACOBS used the shed.

27. In the white shed with red trim, SBSO deputies and detectives found the following:

    a. Four Polymer80 pistol frame jigs, matching the ones needed to make the three 9mm handguns found in JACOBS's car on January 14, 2022;

    b. An electronic drill press;

    c. Depth gauge set;

    d. Tape and die set;

    e. Two BB gun firearm replicas;

    f. Bear spray;

    g. Approximately 2.9 grams of suspected heroin; and

    h. Syringes and drug paraphernalia.

28. SBSO deputies also searched the white shed with green trim in the backyard. It appeared that this shed also belonged to JACOBS based on the fact that his birth certificate and boxes from weapons parts companies to JACOBS were found in the shed as well as J.W.'s statement that JACOBS used the shed.

29. In the white shed with green trim, SBSO found the following:

    a. A short-barrel AR-15 style assault rifle with a black 300-BLK barrel and red lower receiver;

      b.    A short-barrel AR-15 style assault rifle with a 5.56 caliber barrel;

      c.    A black AR-15 style assault rifle with a black 300-BLK barrel;

      d.    A suspected handgun silencer;

      e.    Various firearms parts, including receivers, barrels, trigger assemblies, handgun sights, rifle sights, rifle handguards, rifle handgrips, and adjustable rifle stocks;

      f.    Various magazines and ammunition.

### E. Measurement of the Two Rifles' Barrel Lengths Reveals Violations of Title 26 United States Code 5861(d)

30.    On February 23, 2022, I examined the black and red .300 Blackout caliber ghost gun rifle, with no serial number, and black and silver.300 Blackout caliber ghost gun rifle, with no serial number, found in JACOBS's residence on January 18, 2022.

      a.    I measured the length of the barrel of the black and red privately manufactured rifle to be approximately 12 inches in length.

      b.    I measured the length of the barrel of the black and silver privately manufactured rifle to be approximately 9 inches in length.

31.    Under Title 26, United States Code, Section 5845(a)(3), the definition of a firearm includes a rifle with a barrel or barrels of less than 16 inches in length.

32.    On February 24, 2022, I submitted a query to the National Firearms Registration and Transfer Record ("NFRTR") to

determine if JACOBS had registered these short-barreled rifles as required under Title 26, United States Code, Section 5861(d). On the same day, I learned JACOBS had no firearms registered with the NFRTR in his name.

**F.    JACOBS's Criminal History**

33.  On March 4, 2022, I reviewed certified conviction documents for JACOBS and learned that JACOBS has previously been convicted of the following felony crime punishable by a term of imprisonment exceeding one year:

   a.  On or about March 20, 2014, a violation of California Penal Code in the Superior Court for the State of California, County of Section 487(a)(F) (Grand Theft) in the Superior Court of California, County of Santa Barbara, Case Number 1443571.

**G.    Interstate Nexus**

34.  On March 7, 2022, ATF Interstate Nexus Expert Special Agent Bryan Traverso examined the Colt Government Model MKIV .45 caliber pistol bearing serial number SS10327E recovered from JACOBS's car on January 14, 2022.  Agent Traverso confirmed that the pistol was manufactured outside of the State of California. Because the pistol was found in California, I believe that it has traveled in and affected interstate commerce.

**V.    TRAINING AND EXPERIENCE ON FIREARMS OFFENSES**

35.  From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

11

a. Persons who possess, purchase, manufacture, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices. It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals. Such information is also kept on digital devices.

b. Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices. These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c. Those who illegally possess firearms often sell their firearms and purchase firearms. Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices. This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price. In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they

12

or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

## VI. TRAINING AND EXPERIENCE ON DRUG OFFENSES

36. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

    a.    Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

    b.    Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

    c.    Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the

seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

        d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

## VII. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

37. As used herein, the term "digital device" includes the SUBJECT DEVICE.

38. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

        a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the

Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

    b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

    c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

    d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures

15

are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

39. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

    a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

    b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

40. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

    a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or

16

eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

        b.  In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

        c.  The person who is in possession of a device or has the device among his or her belongings is likely a user of the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress JACOBS's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of JACOBS's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

41. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VIII.    CONCLUSION

42. For all of the reasons described above, there is probable cause to believe that JACOBS has committed a violation of 18 U.S.C. § 922(g)(1): Felon in Possession of a Firearm. There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICE described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this  8th   day of
March, 2022.

*Patricia Donahue*
UNITED STATES MAGISTRATE JUDGE